RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LAW OFFICE OF JOHN H. EGGERTSEN P.C.,

        *Petitioner-Appellant,*

  *v.*

COMMISSIONER OF INTERNAL REVENUE,

        *Respondent-Appellee.*

No. 14-2591

Appeal from the United States Tax Court.
No. 15479-11—Carolyn P. Chiechi, Judge.

Argued: August 7, 2015

Decided and Filed: September 8, 2015

Before: CLAY and SUTTON, Circuit Judges; WATSON, District Judge.*

_____

**COUNSEL**

**ARGUED:** Stephen F. Wasinger, STEPHEN F. WASINGER PLC, Royal Oak, Michigan, for Appellant. Francesca Ugolini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Stephen F. Wasinger, STEPHEN F. WASINGER PLC, Royal Oak, Michigan, for Appellant. Francesca Ugolini, Bethany B. Hauser, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

      SUTTON, J., delivered the opinion of the court in which WATSON, D.J., joined, and CLAY, J., joined in part. CLAY, J. (pp. 12–14), delivered a separate opinion dissenting in part.

_____

*The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

1

—————————

**OPINION**

—————————

SUTTON, Circuit Judge.  In the late 1990s, a law firm organized itself as a corporation and set up an employee stock ownership plan—what tax lawyers call an ESOP—to obtain favorable treatment under the Tax Code.  In 2001, Congress amended the provisions, trying to squelch this tax strategy and giving affected taxpayers a grace period to come into compliance with the new rules.  The law firm did not come into full compliance with the new amendments within the grace period.  The IRS Commissioner took his time too.  He waited until 2011 to try to collect the excise tax (over $200,000) that resulted from the firm's delayed compliance.  At issue in this appeal are two questions:  Do the 2001 amendments prohibit this tax strategy?  Did the IRS wait too long to assess the tax?  We hold that the law firm must pay the tax and affirm the Tax Court's decision to that effect.

I.

In 1998, John H. Eggertsen bought all of the outstanding shares of "J & R's Little Harvest, Inc." and made several changes to the corporation.  App. 46.  The corporation filed an election to be treated as an S corporation for federal tax purposes.  It changed its name to the less-quaint "Law Office of John H. Eggertsen, P.C."  *Id.* at 336.  It established an ESOP, a type of retirement plan that primarily owns securities of the sponsoring employer.  And Eggertsen transferred his ownership shares in the company to the ESOP and into an account allocated to himself.  All of this meant that the law firm's ESOP became the sole owner of the shares of the S corporation Law Office.

Two features of the Tax Code explain the method to these changes.  The first is that S corporations are not taxed at the corporate level; they pass their income through to shareholders who pay any tax due on that income.  26 U.S.C. § 1366.  Once Eggertsen owned the Law Office's stock, any income earned by the Law Office would pass through to him and he would pay tax on it as individual income.  The second is that, in the mid-1990s, Congress made it possible for ESOPs to own shares in S corporations and exempted S corporation ESOPs from

taxes at the plan level. 26 U.S.C. §§ 501(a), 512(e)(3), 1361(b)(1)(B), 1361(c)(6)(B). ESOP participants, such as Eggertsen, are not taxed on income attributable to stock held in the ESOP until that stock is distributed to the participant, say, at retirement. *Id.* §§ 402, 409(a), 501(a); *see generally* Employee Benefits Law §§ 5.I, 6.I (Jeffrey Lewis et al. eds., 3d ed. 2012). After these changes, the Law Office thus would not pay tax on its income but would pass it through to its owner, the ESOP; the ESOP would not owe tax at the plan level; and Eggertsen, who ultimately owned the shares, would not owe tax on the income generated in the ESOP until the stock was distributed at retirement.

This arrangement sheltered considerable income from taxation. That of course does not make it wrong. No one has "a patriotic duty to increase [his] taxes," and "[a]ny one may so arrange his affairs that his taxes shall be as low as possible." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, L., J.), *aff'd*, 293 U.S. 465 (1935). Just as individuals have no duty to pay more taxes than the law requires, however, Congress has no duty to preserve such shelters into perpetuity. Before long, legislators realized that "the income of an S corporation allocable to an ESOP" was totally exempt from "current taxation." H.R. Rep. No. 107-84, at 274 (Conf. Rep.) (2001). That was especially grating given that the benefit often flowed to employees who were the least likely to need it. Many ESOPs, including Eggertsen's, did not have "broad-based employee coverage and [did not] benefit rank-and-file employees as well as highly compensated employees and historical owners." *Id.* Congress responded in 2001. It imposed a 50% excise tax on S corporation ESOPs that violated new rules requiring broad-based employee ownership. 26 U.S.C. § 4979A. By Treasury regulation, this rule came into effect on January 1, 2005, for the Law Office's ESOP. Temp. Treas. Reg. § 1.409(p)-1T(i)(1)(ii) (2005). The new legislation also provided that, if an ESOP did not meet the new requirements, the plan would face other stiff penalties, including loss of its ESOP status. 26 U.S.C. §§ 409(p)(2), 4975(e)(7). By Treasury regulation, this rule also came into effect on January 1, 2005, but the Law Office's ESOP had an additional six months (until June 30, 2005) to comply with respect to the pre-2005 allocation made to Eggertsen. Temp. Treas. Reg. § 1.409(p)-1T(i)(2)(iii)(A).

In response, the Law Office amended the ESOP in an attempt to mirror the new limits. And on June 30, 2005, the Law Office moved the stock allocated to Eggertsen to a non-ESOP account.  *See* Temp. Treas. Reg. § 1.409(p)-1T(b)(2)(v) (permitting this change).

In 2006, the Law Office and the ESOP each filed 2005 tax returns.  The Law Office's return noted that the ESOP owned 100% of the Law Office's stock.  The ESOP's return, as amended, disclosed that the ESOP held $868,833 in assets, of which $401,500 was employer securities (the Law Office's stock).  The Law Office believed it had complied with the new rules and so did not file a Form 5330, the return for the new excise tax.

In 2008, the IRS audited the Law Office to determine whether it owed the excise tax for 2005.  The Law Office denied any such obligation over the next three years.  In 2011, however, the Commissioner issued a deficiency notice, alleging that before the June 30, 2005, change, the ESOP was not in compliance with the excise tax rules and $200,750 of excise tax was due (50% of the $401,500 of Law Office stock held in the ESOP).

The Law Office challenged the deficiency in the Tax Court, disclaiming any tax due and claiming that the three-year statute of limitations barred the assessment.  The Tax Court upheld the imposition of the tax but sided with the Law Office because the limitations clock had expired.  The Commissioner moved for reconsideration.  The court changed its mind.  It held that the limitations period remained open and that the Law Office owed the excise tax.

II.

The Law Office raises three alternative arguments on appeal:  (1) It does not owe any excise tax for 2005; (2) the three-year statute of limitations bars the assessment; and (3) the Tax Court should not have entertained the Commissioner's motion for reconsideration.

A.

*Does the S corporation owe an excise tax?*  Section 4979A(a) imposes an S corporation ESOP-related excise tax in three settings:  First, "[i]f . . . there is any allocation of employer securities which violates the provisions of section 409(p)," 26 U.S.C. § 4979A(a)(3); second, "[i]f . . . there is . . . *a nonallocation year described in subsection (e)(2)(C) with respect to an*

[ESOP]," *id.* (emphasis added); and third, "[i]f . . . any synthetic equity is owned by a disqualified person in any nonallocation year," *id.* § 4979A(a)(4). If any of these circumstances apply, "there is hereby imposed a tax on such allocation or ownership equal to 50 percent of the amount involved." *Id.* § 4979A(a). All agree that the first and third tax-triggering events do not apply here. No prohibited "allocation of employer securities" occurred in 2005, and no ownership of "synthetic equity"—primarily stock options, warrants, and the like, *see id.* § 409(p)(6)(C)—occurred in 2005. At issue is the second trigger italicized above and two questions prompted by it: Was 2005 a nonallocation year described in subsection (e)(2)(C) with respect to the Law Office's ESOP? And, if so, does that alone trigger the excise tax?

The Law Office and the IRS agree that 2005 was a nonallocation year. So do we.

That leaves the question whether this reality triggers the excise tax. It does. That is what the statute says. "If . . . there is . . . a nonallocation year described in subsection (e)(2)(C) with respect to an [ESOP]," to repeat, "there is hereby imposed a tax on such allocation or ownership equal to 50 percent of the amount involved." *Id.* § 4979A(a). The words "such" and "ownership" in "such allocation or ownership" tell us what we need to know. The only way there can be a "nonallocation year" is if there is "ownership": The definition of a "nonallocation year" requires that a specified set of persons "own at least 50 percent" of the relevant S corporation shares. *Id.* § 409(p)(3)(A)(ii). That is just what happened here—when Eggertsen failed to spread ownership of the S corporation among enough individuals.

The calculation of the excise tax reinforces the link between "nonallocation year" and "ownership." The provision cross-referenced in the second trigger—subsection (e)(2)(C)—says that, during the first nonallocation year, the "amount involved" is set "by taking into account the total value of all the deemed-owned shares" of a defined set of persons. *Id.* § 4979A(e)(2)(C). To the extent the phrase "deemed-owned" does not explain the connection to ownership by itself, the Tax Code clarifies the point: "[A]n individual shall be treated as owning deemed-owned shares of the individual." *Id.* § 409(p)(3)(B)(ii). Thus, not only is "nonallocation year" itself defined in terms of ownership, but the method for calculating the amount involved in the first nonallocation year also refers to what is "owned." A "nonallocation year described in (e)(2)(C)" is "such . . . ownership" that triggers the tax.

Imposing the tax in the first nonallocation year also is consistent with the problem Congress was trying to solve. Unless taxpayers with narrow ownership were forced to spread that ownership more broadly or to pay additional taxes instead, nothing would have changed. The Conference Report echoes the point: "A special rule applies in the case of the first nonallocation year, *regardless of whether* there is a prohibited allocation. In that year, the excise tax also applies to the fair market value of the deemed-owned shares of any disqualified person held by the ESOP, even though those shares are not allocated to the disqualified person in that year." H.R. Rep. No. 107-84, at 276 (emphasis added). All sources considered, the excise tax applies and the Law Office owes the IRS $200,750 as a result.

Attempting to fend off this conclusion, the Law Office contends that the tax applies only if there is an "allocation" of stock or "ownership" of synthetic equity during the tax year. The key failing in this argument is that it reads out of the section one of the taxable events described in it: a "nonallocation year described in subsection (e)(2)(C)." It is a "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014). The Law Office offers no coherent role for this provision to play under its interpretation. Because this taxable event, like the other two, is separated by an "or," it creates its own requirements and its own taxable event. All three triggers appear in a subsection entitled "[i]mposition of the tax," and all three should be given content. That is all we—and the Tax Court—have done here.

B.

*Did the statute of limitations run before the Commissioner assessed the excise tax?* The "[g]eneral rule" under § 6501 is that the Commissioner has three years to assess a tax "after the return [is] filed." 26 U.S.C. § 6501(a). "[T]he return" is not any return but "the return required to be filed by the taxpayer." *Id.* If a taxpayer does not file this return, the Commissioner may assess the relevant tax "at any time." *Id.* § 6501(c)(3). In the words of Justice Jackson, once the general counsel of the IRS (then the BIR—Bureau of Internal Revenue), the rule rests on a pragmatic consideration associated with "the system of self-assessment which is so largely the basis of our American system of . . . taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the

physical task of handling and verifying returns may be readily accomplished." *Comm'r v. Lane-Wells Co.*, 321 U.S. 219, 223 (1944). Here, the Tax Court noted—and the Law Office does not dispute—that "Form 5330 is the form that the Commissioner of Internal Revenue has prescribed as the form in which, inter alia, the excise tax under section 4979A is required to be reported." App. 377–78. Form 5330 is "the return" that starts the limitations clock, and the Law Office did not file it for 2005.

There are several exceptions to § 6501's general rule, we must acknowledge, and three of them deserve mention. *First*, the limitations clock may start in some settings even when the taxpayer fails to file the right return—say the taxpayer filed the same return for another reason, *see Lane-Wells*, 321 U.S. at 222–23, or filed the wrong return but with all of the necessary information, *see Germantown Trust Co. v. Comm'r*, 309 U.S. 304, 308 (1940). A key predicate for this exception is that the return filed must contain "sufficient data to calculate tax liability." *Beard v. Comm'r*, 82 T.C. 766, 777 (1984), *aff'd*, 793 F.2d 139 (6th Cir. 1986) (per curiam); *accord In re Hindenlang*, 164 F.3d 1029, 1032–34 (6th Cir. 1999); *see also Bufferd v. Comm'r*, 506 U.S. 523, 528 (1993); *Auto. Club of Mich. v. Comm'r*, 353 U.S. 180, 188 (1957); *Lane-Wells*, 321 U.S. at 223; *Germantown*, 309 U.S. at 308.

In this instance, however, the filed returns would not allow the Commissioner to calculate the Law Office's excise tax liability. To calculate that liability under § 4979A(a) due to the occurrence of a nonallocation year in 2005, the Commissioner would need to know three things: (1) the ESOP owned Law Office stock at some point during 2005; (2) the percentage of the Law Office's stock allocated to each ESOP participant during 2005; and (3) the value of the Law Office's stock during 2005. The Law Office and the ESOP's returns disclosed the first thing (the ESOP owned 100% of the Law Office's stock) and the third thing (the value of the Law Office's stock held by the ESOP was $401,500). But they did not disclose the second thing—necessary to determine how much of the Law Office's stock was subject to the excise tax. Under the relevant provisions, the amount subject to the excise tax due to a nonallocation year ranges from 50% to 100% of the total value of the shares of the relevant S corporation. *See* 26 U.S.C. § 409(p)(3). Without the second piece of information, the Commissioner could not calculate—and most taxpayers would not want the Commissioner to calculate—the key point in that range.

*Second*, the statute of limitations sometimes starts based on a more generous notice standard, which looks not to whether "the return" has been filed but whether a filed form "provides [a] clue" as to an omission. *Colony, Inc. v. Comm'r*, 357 U.S. 28, 36 (1958); *see also Quick's Trust v. Comm'r*, 54 T.C. 1336, 1346–47 (1970). But this notice standard concerns only § 6501(e), a provision with no role to play here. The question is not whether the Law Office made an omission on a filed return; it is whether it filed the right return at all.

*Third*, for the excise tax in § 4979A and other excise taxes, the limitations clock may begin with "the filing of a return . . . on which an entry has been made with respect to" the applicable excise tax. 26 U.S.C. § 6501(b)(4). The Law Office says this rule applies because it made a host of entries on its other returns "with respect to" the § 4979A tax, including everything from the name of the ESOP to facts that would alert the Commissioner to the nonoccurrence of a prohibited allocation in 2005. But if these entries are "with respect to" the excise tax at all, they are only with respect to the Law Office's incorrect interpretation that the tax applies just to prohibited allocations and ownership of synthetic equity, which impose taxation under the *first* and *third* triggers. Because the Law Office made no entry that would alert the Commissioner to the occurrence of a nonallocation year—the *second* trigger and the trigger that applies to *the Law Office*—this exception does not apply.

This argument at any rate fails on its own terms. The text of the exception provides that "the filing of a return . . . on which an entry has been made with respect to [an applicable excise] tax . . . shall constitute the filing of a return of all amounts of such tax which, if properly paid, would be required to be reported on such return." *Id.* To "constitute the filing of a return" for an excise tax—to trigger the exception and start the limitations clock—it must be a return on which amounts of the tax "would be required to be reported." *Id.*; *cf.* Internal Revenue Serv., Internal Revenue Manual § 25.6.1.9.4.3 (Apr. 1, 2007) ("[U]nder IRC Section 6501(b)(4), the filing of an *excise tax return* on which an entry is made for a particular tax constitutes the filing of a return of all amounts of that tax which, if properly paid, would be required to be reported on that return . . . ." (emphasis added)). As to the Law Office and the § 4979A tax, the form on which the excise tax was "required to be reported" was Form 5330. No such form was filed, and no return means no exception.

We appreciate the taxpayer's lament that it seems strange to let the limitations period run until it files the requisite form, which in this instance merely would have reported "no excise tax due." But this takes us back to Justice Jackson's observation about the imperatives of a system of tax collection that turns on self-reporting and to a prior observation of this court that Congress may always change the system. "[T]he door is open," we said in similar circumstances, "for the government to go back, without limit in time, and make assessments against citizens who honestly believed they had made all the returns and paid all the taxes that the law required. . . . The absence of any limitation, under the situation before us, may indeed visit unfair burdens and expense upon innocent taxpayers. If so, Congress can provide the needed remedy." *McDonald v. United States*, 315 F.2d 796, 801 (6th Cir. 1963).

C.

*Did the Tax Court abuse its discretion in entertaining the Tax Commissioner's reconsideration motion?* The Law Office claims that the Tax Court never should have entertained the Commissioner's argument on reconsideration. To recap: The Commissioner initially argued that the general statute of limitations in § 6501 did not apply; the only applicable limitations period, he claimed, was the one in the § 4979A excise tax provision. The Tax Court agreed with the Commissioner, but held that, under that theory, the limitations period had run. The Commissioner then realized its mistake, and asked for reconsideration because the Tax Court had made a "substantial error of law." R. 22 at 1. The relevant statute of limitations was § 6501, the Commissioner explained, subject to a possible extension by § 4979A. The Tax Court granted reconsideration, conceded it (and the Tax Commissioner) had erred, agreed with the Commissioner's new position, and concluded that the limitations period had not run.

The Law Office criticizes the Commissioner's shifting positions as nothing more than "a classic case of sand-bagging." Appellant's Br. 39. We don't think so. Keep in mind that the Tax Commissioner did not benefit from its initial error, making it difficult to look at its mistaken initial foray as a strategic ploy, as opposed to a case of misapprehension. Labels to the side, the key question is whether the Tax Court abused its discretion in granting the reconsideration motion. *See Louisville & Nashville R.R. v. Comm'r*, 641 F.2d 435, 443–44 (6th Cir. 1981).

In our view, the Tax Court did not abuse its discretion by using reconsideration to correct its mistake. We know of no case—and the Law Office points to none—where a lower court, acting within the bounds of the applicable procedural rules, granted reconsideration to correct an acknowledged mistake and a federal court held on appeal that doing so was incorrect. That is not surprising. This circuit and the Tax Court have both held that errors of law warrant reconsideration. *Schlaud v. Snyder*, 785 F.3d 1119, 1124 (6th Cir. 2015) (per curiam); *Knudsen v. Comm'r*, 131 T.C. 185, 185 (2008). Committing an error of law indeed is itself an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996). The Law Office's response—that reconsideration was inappropriate because the Commissioner had forfeited its later (correct) argument as to the applicable statute of limitations—is beside the point. The Tax Court granted reconsideration to fix *its* mistake, not the Commissioner's. As a general matter, courts have a more vested interest in correcting mistakes of law than litigants do. Because the need to correct its mistake necessarily corrected the Commissioner's mistake, the Tax Court did not abuse its discretion in excusing the usual rule that "an argument raised for the first time in a motion for reconsideration . . . *generally* will be forfeited." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331–32 (6th Cir. 2009) (emphasis added).

The Law Office also invokes judicial estoppel to argue that the Tax Court was wrong to address the Commissioner's new argument. That doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The Law Office invokes the doctrine because the Commissioner convinced the Tax Court to accept its first (incorrect) legal argument and then, when that argument did not lead to the desired result, turned around and pressed a new, contradictory argument.

Judicial estoppel does not apply. Courts typically "resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." *Id.* at 753. The Commissioner acknowledged it made a mistake, and there is nothing in the record to suggest there was anything more to it than that. That mistake made it into the Tax Court's initial opinion and we will not "imping[e] on the truth-seeking function of the court" by preventing the Tax Court from correcting what both parties and the Tax Court all now agree was a legal error.

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008). Judicial estoppel also does not usually apply to shifting *legal* arguments; it typically applies to shifting *factual* arguments.  18B Charles Alan Wright et al., Federal Practice and Procedure § 4477 (2d ed. 2015); *see also Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004) ("The doctrine of judicial estoppel bars a party from asserting a position that is contrary to one the party has asserted *under oath* in a prior proceeding." (emphasis added)).  Here, the Law Office's call for judicial estoppel revolves around the Commissioner's shift in legal position— what statute of limitations applies to the § 4979A excise tax.  Last of all, there is a high bar to estopping the federal government from enforcing the correct interpretation of a law because doing so "undermine[s]" "the interest of the citizenry as a whole in obedience to the rule of law." *United States v. Williams*, 612 F.3d 500, 511 (6th Cir. 2010) (quoting *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60 (1984)).  The Commissioner is a federal officer and all citizens, even Eggertsen, suffer in the long run when we estop the government from correcting a legal mistake.

For these reasons, we affirm.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

CLAY, Circuit Judge, dissenting in part.  I respectfully dissent from the majority's conclusion that the Tax Court properly allowed the Commissioner of the I.R.S. to benefit from his complete reversal of position on the governing statute of limitations for excise taxes imposed under 26 U.S.C. § 4979A.  In the merits briefing before the Tax Court, the Commissioner made the deliberate decision to argue that § 4979A(e)(2)(D) provided the relevant statute of limitations.  We know that the Commissioner directly considered the possibility that § 6501 might apply, but determined that it did not, because the Commissioner *explicitly argued* that "I.R.C. § 6501(a) is not the governing period of limitations under the facts of this case."  (A.R. 373.)  The Tax Court accepted the Commissioner's position that § 4979A(e)(2)(D) applied but determined that under that standard the deficiency action was time barred.  Only upon losing before the Tax Court did the Commissioner determine that his earlier argument was in error.  Without proffering any justification for his change in position beyond asserting that his earlier position was incorrect, the Commissioner sought reconsideration on the basis that the Tax Court had committed the substantial error of accepting his own argument that § 4979A(e)(2)(D) applied.  Then, in direct contravention of his earlier position, the Commissioner argued that § 6501 provided the governing statute of limitations, *not* § 4979A(e)(2)(D).  The Tax Court again agreed with the Commissioner, and, applying § 6501, held that the Law Office was bound to pay the excise tax after all.

The majority finds no cause for concern in the Tax Court's acceptance of this stark reversal because of our conclusion that the second, contradictory position taken by the Commissioner and the Tax Court is the correct one—§ 6501 provides the governing standard.  Taking reassurance from this result, however, overlooks a troubling reality.  Namely, if the Commissioner had prevailed under his first theory, the error may well have gone uncorrected.  When the Internal Revenue Service is permitted to litigate according to its whims in the Tax Court, knowing that a do-over will be available if it does not succeed on the theory that at first

seems most expedient, tax law jurisprudence suffers no less than the integrity of the rule of law and the courts.

Contrary to the majority, I believe the circumstances of this case may well warrant an application of judicial estoppel, a doctrine that "preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990).

The majority argues that judicial estoppel is inappropriate because the doctrine is not typically applied to inconsistent legal arguments, but rather to inconsistent factual positions. The case law does not so clearly delineate between the two, and in fact judicial estoppel has been applied in numerous instances where a party reversed itself on an issue of law. *See, e.g.*, *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 294 (5th Cir. 2004) (holding that judicial estoppel could be applied to prevent a party from reversing its position on the governing law); *see also Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (holding that judicial estoppel "applies to a party's legal as well as factual assertions"); *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) (same); *Murray v. Silberstein*, 882 F.2d 61, 66-67 (3d Cir. 1989) (estopping a party from seeking damages when the same party had earlier obtained a preliminary injunction by arguing that the Eleventh Amendment barred any damages remedy).

The majority also finds that judicial estoppel should not apply based on the Commissioner's mere representation that his first argument was a "mistake." We should be reluctant to so credulously rely on the Commissioner's representations. No reasonable explanation has been offered for how the Commissioner came to advocate an erroneous position (or to later conclude that the first position was erroneous), and we know from the Commissioner's own briefing before the Tax Court that he initially considered and rejected the possibility that § 6501 applied. Although it is true that "'[t]he Government may not be estopped on the same terms as any other litigant,'" *United States v. Williams*, 612 F.3d 500, 511 (quoting *Heckler v. Cmty. Health Servs.*, 67 U.S. 51, 60 (1984)), this Court has not held the government to be immune from judicial estoppel, *see id.*; *Reynolds v. C.I.R.*, 861 F.2d 469, 472-73 (6th Cir.

1988) (applying judicial estoppel against the Commissioner of Internal Revenue); *Bunting v. R.R. Ret. Bd.*, No. 92-3879, 7 F.3d 232, 1993 WL 372735 (6th Cir. 1993) (table) (applying judicial estoppel against the government).  Instead, we have acknowledged that the government may be judicially estopped, among other circumstances, where affirmative misconduct has occurred.  *Michigan v. City of Allen Park*, 954 F.2d 1201, 1217 (6th Cir. 1992); *United States v. River Coal Co.*, 758 F.2d 1103, 1108 (6th Cir. 1984).

I would remand to the Tax Court to develop a record about the circumstances surrounding the Commissioner's reversal in position, including any communications between the parties and the court, to determine whether the Commissioner's reversal was made in good faith. In view of the majority's holding that judicial estoppel cannot apply in this case, I respectfully dissent.